ENVIRONMENTAL PROTECTION IN-FORMATION CENTER, INC., a nonprofit corporation; and, Sierra Club, Inc., a non-profit corporation, Plaintiffs,

v.

PACIFIC LUMBER COMPANY, a Delaware corporation; Scotia Pacific Holding Company, a Delaware corporation; and Salmon Creek Corporation, a Delaware corporation, Defendants.

No. C–98–3129 MHP.

United States District Court,
N.D. California.

March 15, 1999.

Brian Gaffney, Oakland, CA, Sharon E. Duggan, Law Offices of Sharon E. Duggan, San Francisco, CA, Tara L. Mueller, Environmental Law Foundation, Oakland CA, Brendan Cummings, Berkeley, CA, Richard M. Pearl, Richard M. Pearl Law Offices, San Francisco, CA, for Environmental Protection Information Center, Sierra Club, Plaintiff.

Bruce S. Flushman, Edgar B. Washburn, David M. Ivester, Christopher J. Carr, Washburn Briscoe & McCarthy, San Francisco, CA, Jared G. Carter, Frank Shaw Bacik, Carter Behnke Oglesby & Bacik, Ukiah, CA, for Pacific Lumber Co., Scotia Pacific Holding Co., Defendants.

Edgar B. Washburn, Washburn Briscoe & McCarthy, San Francisco, CA, Jared G. Carter, Carter Behnke Oglesby & Bacik, Ukiah, CA, for Salmon Creek Corp., Defendant.

## MEMORANDUM AND ORDER

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATEL, Chief Judge.

Plaintiffs Environmental Protection Information Center ("EPIC") and Sierra Club bring this action against defendants Pacific Lumber Company ("PALCO") and its subsidiaries Scotia Pacific Holding Company and Salmon Creek Corporation alleging violations of section 7(d) of the Endangered Species Act ("ESN"), 16 U.S.C. § 1536(d), and seeking declaratory and injunctive relief. On August 14, 1998, Judge Thelton E. Henderson granted plaintiffs' motion for a temporary restraining order enjoining PALCO from conducting or allowing any logging activities of any kind within the boundaries of Timber Harvest Plans ("THP") Nos. 1–96–413 HUM, 1–96–307 HUM, and 1–97–286 HUM. *EPIC v. Pacific Lumber Co.*, Case No. C–98–3129 TEH, slip op., at 5 (N.D.Cal., August 14, 1998). This court subsequently related this action to an action already pending before the court, *Coho Salmon v. Pacific Lumber Co.*, Case No. C–98–0283 MHP, which was filed on January 26, 1998.

Now before the court is plaintiffs' motion for preliminary injunction enjoining PALCO from conducting or allowing any logging activities within the above THPs. The court conducted an initial hearing on the preliminary injunction motion on September 3, 1998. At the conclusion of the hearing, the court converted the temporary restraining order into a preliminary injunction, and ordered further hearings on the limited question of whether coho salmon are currently present or were historically present within the regions de-

scribed by the THPs at issue here. The court heard testimony on the presence of coho salmon in the watersheds at issue on September 23 and 24, 1998, and October 21 and 22, 1998. At these hearings, the court heard testimony from plaintiffs' witnesses, Michael Evenson, Dr. Terry Roelofs, and Jason Johnson, and defendants' witness, Dr. Jeffrey C. Barrett.

Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order. This memorandum and order incorporates the court's findings of fact and conclusions of law regarding plaintiffs' motion for preliminary injunction.

*BACKGROUND*

At the root of this dispute are lands which are subject to an agreement between PALCO and its parent company, MAXXAM, Inc., the federal government and the state of California to preserve a 7,500 acre tract of old growth redwood forest in Humboldt County, California. The agreement is commonly known as the "Headwaters Agreement." *See* 63 Fed. Reg. 37900–02 (July 14,1998) [Cummings Decl., Ex, F]. The Headwaters Agreement originally anticipated the exchange of the tract of old growth forest for federal and state assets with a value of $300 million and other properties. *Id.* The Headwaters Agreement also called for, among other things, the development and submission by PALCO of an incidental take permit ("ITP") application pursuant to section 10(a)(1)(B) of the ESA, 16 U.S.C. § 1539(a). *Id.*

PALCO subsequently applied for an ITP pursuant to section 10(a)(1)(B) to the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively, "the Services"). *See* 63 Fed.Reg. at 37900. If granted, the ITP would permit PALCO to legally conduct timber harvesting and other proposed

activities on PALCO lands located in Humboldt County, California.[1] These lands are within the Mattole River, Sulphur Creek, and Bear Creek-watersheds. Moreover, the lands comprise areas which are purportedly the habitats of several species listed as threatened or endangered under the ESA, among which include the marbled murrelet (*Brachyramphus marmoratus*), the northern spotted owl (*Strix occidentalis caurina*), and the coho salmon (*Oncorhynchus kisutch*). In conjunction with its permit application, PALCO submitted a proposed Habitat Conservation Plan ("HCP") in accordance with the requirements of section 10(a)(2)(A), 16 U.S.C. § 1539(a)(2)(A), and a proposed implementation agreement. 63 Fed.Reg. at 37900.

The FWS subsequently issued a notice of receipt and availability for public comment for PALCO's permit application, HCP, and proposed implementation agreement pursuant to the public comment requirement of section 10(c) of the ESA. 63 Fed.Reg. at 37900–01. On November 16, 1998, the FWS and NMFS also initiated "formal consultation" on the Services' proposal to issue an ITP to PALCO pursuant to section 10(a)(1)(B) of the ESA and its implementing regulations at 50 C.F.R. Parts 17 and 222, respectively. *See* Letter dated November 16, 1998 from the Services to John Campbell ("November 16 letter").

A. *Watersheds and THPs*

This action concerns PALCO's timber harvesting activities in three THPs: THP Nos. 1–96–413 HUM ("THP–413") 1–96–307 HUM ("THP–307"), and 1–97–286 HUM ("THP–286"). Under California's Z'berg–Nejedly Forest Practice Act of 1973, Cal.Pub.Res.Code § 4511 *et seq.*, timber harvesters must submit a Timber Harvest Plan prepared by a registered

---

1. The court notes that the Services issued an ITP and biological opinion on March 1, 1999, as part of the finalization of the Headwaters deal, and presently, several motions for summary judgment and dismiss are pending before the court regarding the effect of the ITP's issuance.

professional forester to the California Department of Forestry and Fire Protection ("CDF") for approval before beginning any logging operations. Cal.Pub.Res.Code §§ 4581–4582.75. The THP must contain a description of, among other things, the silvicultural methods to be applied, the type of logging equipment to be used, and methods to avoid excessive erosion. Cal. Pub.Res.Code § 4582.

THP–413 and THP–307 both lie within the Mattole River watershed, whereas THP–286 lies within the Bear Creek drainage. The Mattole River watershed includes the Mattole River, and its tributaries, the North Fork Mattole River, the East Branch North Fork Mattole River, and Sulphur Creek. See Def. Ex. C–2. Sulphur Creek flows into the East Branch North Fork Mattole River, which flows into the North Fork Mattole River about five miles north of its confluence with the main stem of the Mattole River. Id. THP–413 is divided into two tracts, one of which lies on the banks of the Sulphur Creek above the confluence of Sulphur Creek and the East Branch North Fork Mattole River. See Def. Exs. C–2 & C–3. The other tract in THP–413 sits above Sulphur Creek, along one of its tributaries. THP–307 consists of four separate tracts of land within the Sulphur Creek watershed, the largest of which extends along the upper reaches of Sulphur Creek. See id. According to PALCO, both TBP–413 and THP–307 include no-harvest and selective-cut buffer zones where the harvest areas lie adjacent to streams. For example, Barrett testified that Class I streams, or those streams with fish on a seasonal

basis, had no-cut buffers of 170 feet, and Class II streams, or those stream with other aquatic life forms, had a 100 foot no-cut buffer. PALCO clear-cuts timber from the rest of THP–413 and THP–307. Id. Also, according to Barrett, the THPs require that PALCO commit "zero net sediment" delivery from its logging operations by improving logging roads and implementing other restorative measures.

The Bear Creek drainage is part of the Eel River watershed, of which Bear Creek is a tributary, and includes the West, South and East Forks and the South Branch of Bear Creek. See Def. Ex. C–4. It is a relatively small watershed, consisting of 8.4 square miles, and has "moderate to very steep" slopes resulting in a "moderate to high" erosion hazard rating. Pl. Ex. 11, at 2. THP–287, which lies within the Bear Creek drainage, consists of three separate parcels of forest that lie above Bear Creek and is comprised of both "rehabilitation harvest" and "overstory removal harvest." Def. Ex. C–4. One of the parcels lies on a mountain ridge, far from any streams. Id.

Roelofs described the effects of PALCO's logging operations on the aquatic environment in the THPs described above.[2] In doing so, Roelofs first referred to a 1994 study on the status of coho in California which concluded that coho salmon have declined dramatically in the last sixty years to less than 6% of their abundance during the 1940s and have probably declined at least 70% since the 1960s.[3] See Brown, L.R., Moyle, P.B. and Yoshiyama, R.M., "Historical Decline and Current Sta-

2. With respect to the coho salmon and other salmon species, the HCP submitted by PALCO as part of the ITP issuance process requires: measures including a 100–foot (30.5 meter) no cut buffer on all Class I streams and a 30–foot (9.1 meter) no cut buffer on all Class II streams pending completion of watershed analysis and a minimum 30–foot (9.1.meter) no cut buffer on Class I streams and a maximum 170–foot (51.8 meter) no cut buffer on Class I and Class II streams after watershed analysis has been completed. Additional measures designed to minimize impacts from mass wasting, wet

weather road use, road construction and other activities, and to address cumulative impacts have also been included in the HCP.
64 Fed.Reg. 3483, 3484 (Jan. 22, 1999).

3. The significance of this dramatic decline is notable because Brown et al. used an estimation procedure to derive an overall coho population "that most likely overestimate abundance 'to avoid exaggerating the extent of population depletion." Brown et al., 14:2 N.Am.J. Fish.Mgmt. at 240.

tus of Coho Salmon in California," 14:2 N.Am.J.Fish.Mgmt. 237,250 (May 1994) [Pl.Ex. 10]. Like Roelofs, Brown *et al.* attributed the decline to a number of factors, primary among which was the loss of stream habitat. *Id.* at 251 (citations omitted). Although Brown et al point to several factors that have contributed to habitat loss, "[d]amage was particularly severe in coastal streams affected by logging," which have exacerbated erosion and land slippage through the construction of logging roads and by the removal of vegetative ground cover. *Id.* Erosion, or "mass wasting," increases the amount of sediment—or, aggradation—in streams. If sufficient amounts of sediment are deposited in pools, the volume and complexity of the pools are significantly reduced, impairing sheltering habitat and increasing water temperature. Because the coho's ability to find food depends on the water clarity, high levels of turbidity and silting have a significant impact on the coho's ability to feed. Finally, the effects of logging are not localized, and thus, erosion in the upper reaches of the timber harvesting plan may have significant downstream effects. For example, Roelofs stated that increased erosion in the Sulphur Creek drainage could have significant downstream effects in the East Branch North Fork Mattole River and the North Fork Mattole River. In contrast, Roelofs testified, the downstream effect of erosion in the Bear Creek drainage would have less impact on coho habitat in the Eel River.

## B. *Coho Salmon Characteristics*

The court's understanding of the physical and habitat characteristics of coho salmon were derived primarily from the testimony of Dr. Terry Roelofs. Roelofs has been a professor of fisheries at Humboldt State University ("HSU") for 28 years and specializes in salmonids and stream ecology. He has published numerous articles on the effects of sedimentation on anadromous fish. Roelofs has also devised stream survey methodologies and presence/absence protocols. At HSU, Roelofs advises several graduate students and trains both graduate and undergraduate students to conduct stream surveys to assess habitat and identify fish species. Although Roelofs has not surveyed any streams or rivers within the Bear Creek or Sulphur Creek drainages, his opinions on the presence of coho in these drainages are based on stream surveys conducted by the California Department of Fish and Game ("CDFG"), PALCO and others and a review of the literature.

Several anadromous fish species are found in the rivers and streams of northern California, including the coho, or silver, salmon ("coho"), the chinook salmon ("chinook"), and the steelhead rainbow trout ("steelhead"). Although each of these fish species share some traits, they exhibit different physical features, especially in size and spotting, growth rates, tolerances to habitat conditions and temperatures, allowing fisheries biologists to distinguish and identify the species. Because much of the debate during the hearings centered on whether the fish identified in the drainages at issue were coho or steelhead, the court focuses primarily on the characteristics which distinguish these two anadromous fish.

Roelofs characterized the optimal habitat for juvenile coho as being "complex," consisting of deep pools of greater than one meter in depth moving approximately two to three feet per second over a substrate ranging from marble to tennis ball size pebbles and containing large quantities of "logs, rootwads, or boulders in heavily shaded sections of stream." Brown et al., 14:2 N.Am.J.Fish.Mgmt. at 238. Coho prefer to spawn in streams with a 1–2% gradient. The ideal water temperature for coho is between 55 $\bar{F}$ and 60 $\bar{F}$, with temperatures ranging from 68 $\bar{F}$ to 70 $\bar{F}$, increasing their susceptibility to disease and fatigue, and temperatures ranging from 74 $\bar{F}$ to 76 $\bar{F}$ being lethal to the coho within 24 hours.

In contrast, steelhead appear to be of a more hardy stock than coho and have a better chance of surviving in poor habitat. According to Roelofs, steelhead prefer

pools which are shallower with faster moving water—although large steelhead may share the same pools as coho—and are able to tolerate warmer temperatures without the same negative effects. Steelhead tend to be more hearty as well, having a much greater leaping ability than coho, and thus able to surmount barriers or obstructions that coho are unable to pass.

The migration pattern of coho is integral in determining their presence or absence in the streams and rivers of northern California. Coho generally exhibit a "relatively simple" three-year life cycle. 62 Fed.Reg. 24588 (May 6, 1997) [Pl.Ex. 6]. Adults typically begin their freshwater spawning migration in the late summer and fall, spawn by mid-winter and then die. *Id.* In California, the spawning migrations upstream normally occur from October to March and generally peak from November to January. Brown *et al.,* 14:2 N.Am.J.Fish. Mgmt. at 239. Roelofs testified that although the odds are high that coho will return to the stream into which they were hatched, a small fraction of coho stray and form new coho colonies. Depending on stream temperatures, coho eggs incubate in "redds," i.e. gravel nests excavated by spawning females, for 1.5 to 4 months before hatching. Juvenile coho, or fry, typically live in the freshwater streams along the Pacific coast for up to 15 months, and then migrate downstream to the ocean during late March and early April, usually peaking in mid-May if conditions are favorable. *Id.* According to Roelofs, young-of-the-year salmonids that have hatched in the spring can be seen in pools by July or August. At this stage, coho fry are generally 1.5 to 3 inches long. In contrast, young-of-the-year steelhead emerge from their redds later than young-of-the-year coho and tend to be somewhat smaller.

Other physical characteristics distinguish the coho and steelhead. For example, the dorsal fin of juvenile steelhead tends to be spotted, whereas the coho's dorsal fin is clear. Although the fins are otherwise similar in color, the sickle-shaped anal fin of the coho tends to be

much longer than the anal fin of the steelhead. Another distinguishing physical trait of the two species are the "par," or oval markings on the skin of the fry. The coho's par tend to be narrow and widely-spaced whereas the par of the steelhead are generally thumbprint-shaped. Finally, a personality trait distinguishes the two species: the coho are less shy than steelhead.

### C. *Coho Salmon Presence/Absence*

After four days of testimony, the complexities of conclusively determining the presence or absence of coho in the drainages at issue became apparent to the court. First, the distribution of coho in streams in northern California fluctuate due to overall climatic conditions as well as changes in the local habitat conditions. *See* Brown *et al.,* 14:2 N.Am.J.Fish.Mgmt. at 248. Because coho populations tend to vary throughout the region depending on climate and habitat quality, coho may be absent from an area for as many as fifteen years before re-establishing a colony. Poor coho habitat may change over time and increase in complexity, and vice versa, becoming more or less attractive to coho. A significant limitation therefore arises from the paucity of historical data and stream surveys of native coho populations. Second, the overall reduction of coho numbers in northern California streams have reduced the probability of observing coho. Thus, if coho are observed, then their presence is conclusively established; however, if coho are not observed, then one can only state that no coho were observable. Finally, the court notes that observing coho and its habitat in the field is not an exact science. A comparison of the various stream surveys, including those conducted in close proximity in time, failed to show correspondence in terms of physical features, i.e., pool size, depth, temperatures, and habitat features, that the court would have assumed to be fairly constant. The court is particularly cognizant of these limitations in ascertaining whether coho are present in the watersheds at issue here.

The testimony demonstrated that no systematic coho presence/absence surveys have been conducted over time by the CDFG or PALCO in either the Bear Creek drainage or the watershed composed of the North Fork Mattole River, the East Branch North Fork Mattole River, and Sulphur Creek. Rather, the testimony adduced only that a series of *ad hoc* habitat surveys have been conducted over the past thirty years. Only the flurry of surveys conducted over the past year in preparation for this litigation have focused on coho presence/absence. Three different presence/absence survey methodologies were described by Roelofs and Barrett and used in these surveys: (1) visual observation from the streambank; (2) direct visual observation with the use of a face mask and snorkel; and (3) electrofishing, which involves placing into the water a small electrical current towards which fish are attracted and then stunned with Alka Seltzer. According to Roelofs, streambank observation is a "marginal" survey technique in comparison to direct visual observation or electrofishing. Moreover, the accuracy of both visual observation methods depend on the quality of the view the observer has of the fish. Barrett placed great emphasis on electrofishing as being the most accurate observational method, and characterized himself as an "electrofishing guy." Roelofs and Johnson also described a number of protocols for presence/absence surveys. Of relevance, the court notes that the NMFS protocol for determining coho absence requires three consecutive years of surveys of pools throughout the basin before a fish species may be declared absent.

### 1. Bear Creek Drainage

Presence/absence surveys for coho in the Bear Creek drainage do not extend far into the past. It is undisputed, however, that coho have been observed in Bear Creek. *See* Pl.Ex. 21. On December 16, 1987, Greg Moody and George Donkor of the "CCC" and Gary Flosi of the CDFG conducted a stream survey on Bear Creek designed to recover coded wire tagged chinook salmon from the PALCO bridge up to one mile upstream. Pl.Ex. 12. They observed 1 live coho, 16 live chinook and 2 live steelheads. *Id.* On January 10, 1992, in a survey designed to determine broadly "which anadromous fish are utilizing" Bear Creek from its confluence with Eel River to the PALCO bridge, one live chinook and three live coho were found. *Id.* Again on December 18, 1992, sixteen live chinook, two live coho and three unknown live fish were recorded. *Id.* Thus, coho salmon have been present in the Bear Creek watershed. Furthermore, these observers determined that Bear Creek and its tributaries provided suitable habitat conditions for coho. For instance, the CDFG determined the "total length and depths of pools in Bear Creek were approaching conditions consistent with high-quality coho habitat." Pl.Ex. 11, at 2. On cross-examination, Barrett also conceded that PALCO listed Bear Creek as a coho stream in the HCP submitted to the Services.

On January 1, 1997, a large "debris torrent" swept through Bear Creek causing severe channel aggradation and eliminating "large woody debris," deep pools and riparian vegetation on the main stem of Bear Creek to its confluence with the Eel River. *Id.* at 4. The debris torrent thus erased many "suitable habitat features for salmonids," including juvenile coho habitat, in the Bear Creek drainage. *Id.* The court further ascertained from Barrett that the January 1, 1997, torrent originated on PALCO lands and may have been the result of PALCO logging practices.

PALCO now maintains that neither coho nor suitable coho habitat are present in the Bear Creek drainage. A series of stream surveys were subsequently conducted as part of a recovery study of the Bear Creek drainage. On August 20, 1997, Scott Downie of the CDFG and Moody[4], then a fish-

---

4. Roelofs testified that fisheries specialists such as Scott Downie, Larry Preston, Dennis Halligan, and Dave McCloud are all capable of distinguishing between coho, chinook and steelhead.

eries biologist for Scotia Pacific Holding Company, conducted an electrofishing survey of Bear Creek and observed numerous steelhead rainbow trout, squawfish and sculpin, but detected no coho. Def. Ex. S. Another electrofishing survey was conducted on August 5, 1998, by Barry Collins and Caroline Jezierski, and again only steelhead, sculpin and sucker fish were detected. *See* Def. Ex. T. Finally, in a survey commissioned by Barrett, Dr. Tracy W. Hillman, an aquatic ecologist for BioAnalysts, Inc., conducted a fish survey using the direct visual observation survey method, but detected no juvenile coho in Bear Creek. *See* Def. Exs. U & V. Although none of the surveys conducted by PALCO since the debris torrent have detected coho, PALCO stated in a submission dated July 11, 1997, to the "Coast Area Office Resource Management" signed by Thomas M. Herman, of the Scotia Pacific Holding Company, that "[c]oho salmon are known to occur in the [Biological Assessment Area] in the Eel River in some of its tributaries including Bear Creek." Pl.Ex. 21, at 2.

Finally, the court notes the Bear Creek survey conducted by plaintiffs' expert, Jason Johnson, on August 5, 1998. *See* Pl. Ex. 16. Johnson is presently an undergraduate student at HSU obtaining a B.Sc. in natural resources planning and interpretation and a minor degree in fisheries biology. As part of his classroom experience, Johnson has taken courses in coastal stream management and performed intensive fieldwork which required the identification of coho, chinook and steelhead and other fish species, as well as visual observational methods such as the direct visual observation and electrofishing. When questioned by the court and by PALCO's counsel, Johnson was adept at recounting the distinguishing characteristics of coho, chinook and steelhead. Johnson is also a former student and employee of Roelofs,

who indicated that he is confident of Johnson's ability to identify coho and to distinguish juvenile coho from steelhead and chinook. However, Johnson's body of field and educational experience is substantially less than a number of the other surveyors cited. Johnson was recently employed as a field coordinator/technician for William M. Kier Associates ("Kier"), a consulting firm that is presently completing a coho presence/absence study for NMFS. In the course of his duties at Kier, Johnson participated in stream surveys to determine the presence or absence of coho in both the Bear Creek and Sulphur Creek drainages using a protocol devised by Kier and NMFS.[5]

On August 5, 1998, at approximately 1 PM, Johnson and Trevor Lucas, a graduate student in the HSU fisheries department, began surveying Bear Creek. Their data sheet records their observation of 2 coho and 2 steelhead in a pool 600 feet above the confluence of Bear Creek and Eel River, and 5 coho in the next pool downstream. He further records the pool temperatures to be 72 F̄ and 74 F̄, nearly within the lethal temperature range for coho. Immediately prior to the arrival of Johnson and Lucas, Collins and Jezierski had left Bear Creek after conducting their electrofishing stream survey. *See* Def. Exs. S & T. According to Collins, no coho were observed, but a large quantity of steelhead and sculpin were observed. Def. Ex. T. The court sought to resolve the differences between the Johnson and Collins surveys, but was left serious concerns regarding the accuracy of Johnson's data. First, Collins and Jezierski used the more reliable electrofishing method in conducting their survey. Second, Johnson observed far more coho than previously observed in 1987 or 1992, even after the debris torrent eliminated much of the suitable coho habitat in Bear Creek. Third,

**5.** According to Johnson, the protocol consists of traversing a stream subjectively selecting pools for observing the presence of coho. Once coho were observed, the surveyor could end the survey. As part of the survey, the surveyor was required to measure the pool length, the width, the average and maximum depth of the pools, the air and water temperatures and to identify and count all the fish observed within a pool.

Johnson recorded extremely high temperature levels in the pools sampled. Finally, Johnson was unable to provide an explanation for the difference in the nearly contiguous observations. After reviewing all the circumstances and testimony, the court does not find Johnson's observations of coho in Bear Creek to be credible.

In conclusion, however, the court finds that Bear Creek is a coho stream for the purposes of its section 7(d) analysis given the historical presence of coho in Bear Creek and potential for the natural evolution of the steam habitat to be suitable for coho. Although the court recognizes that the debris torrent eliminated much of the suitable coho habitat in Bear Creek, the court further finds that the debris torrent originated on PALCO lands and appears to have been caused, at least in part, by its logging practices.

### 2. Mattole River Watershed

It is undisputed that coho are present in the main stem of the Mattole River. *See, e.g.,* Brown *et al.* at 245. However, the number of coho in the Mattole River watershed has declined dramatically during the 1981–89 period, with a count of 50 recorded in 1989.[6] Def. Request for Jud. Not., Ex. 1 at 559. The relevant debate during the hearings focused on whether coho were present within the North Fork Mattole River, the East Branch North Fork Mattole River and Sulphur Creek. Some historical survey data exists for these watercourses although both parties concede that this historical data is not well developed. As an initial matter, the court notes that one publication stated that coho are or have been present in the North Fork Mattole River. Hassler, T.J., Sullivan, C.M., and Stern, G.R., "Distribution of Coho Salmon in California," Cal. Dep't

Fish & Game Final Rpt. Contract No. FG7292, at 13 (February 1991) [Pl.Ex. 4] (citing Boberg, J., and Kenyon, C., "Stream Inventory: Humboldt County," Cal. Dep't Fish & Game (June 1979) [Pl. Ex. 5] ). The stream inventory by Boberg & Kenyon, however, does not indicate the method by which it determined the presence of coho in the North Fork Mattole River. *See* Boberg and Kenyon. Roelofs also testified that the historical reach of coho most likely included both the Mattole River as well as its tributaries, the North Fork Mattole River, East Branch North Fork Mattole River and Sulphur Creek.

Several stream surveys were presented to the court to prove either the presence or absence of coho salmon in the Mattole River watershed. In a streambank survey of the East Branch North Fork Mattole River on June 22, 1966, approximately 500 fish per 100 feet of stream were observed, most of which were determined to be steelhead fingerlings between ¾ and 2 inches long. Def. Ex. G. Although the surveyors did not find any coho, the court recognizes that the survey was only a streambank survey and that the purpose of the survey was not specifically to determine the species composition in the North Fork Mattole River. The same surveyors conducted a stream bank survey of the North Fork Mattole River on August 4, 1966, from the mouth to ten miles upstream. Def. Ex. F. Again, no coho were identified, but the surveyors observed approximately 25 steelhead ranging from 1.5 to 4 inches in length. The survey concluded that "[t]he North Fork should be managed for anadromous fish. The removal of the logs from the impassable barrier would open. Another 2 miles of usable spawning gravel." *Id.*

---

6. In a memorandum to William Imboden of the California Department of Forestry and Fire Protection, the CDFG notes that

reviewing agencies should be looking for the maximum protection possible to avoid any erosion resulting in subsequent sedimentation of streams, loss of any existing woody debris (including potential sources

for recruitment) for instream cover and any increased water temperature ... Such action would help offset sediment discharge that is normally expected to come off a THP site even when all of the available best management practices are in place and presumably implemented on the ground.

Def. Req. Jud. Not., Ex. 1, at 559–61.

The CDFG conducted two surveys from June 30 to July 2, 1982, to assess the East Branch North Fork Mattole River for "its value as anadromous fish habitat." One survey ranged from the mouth of the East Branch North Fork Mattole River to "Tributary F," located 3 miles upstream, and the second survey began at Tributary F and continued 3.5 miles upstream. *See* Def. Exs. B & H. Both surveys appear to have been from the streambank rather than by electrofishing or direct visual observation. The surveyors of the bottom half of the East Branch North Fork River recommended that the East Branch North Fork Mattole River "should be managed as an anadromous fish stream," and noted that "[a]dequate spawning and rearing habitat is available for anadromous fishes for approximately the first two miles on the East Branch." Def. Ex. H, at 4. Moreover, the surveyors observed approximately 100 salmonids per foot of river, but do not distinguish between chinook and coho. *Id.* at 3. Finally, several obstructions were noted; however, only one was considered a "possible" barrier to fish migration. *Id.* The second survey concluded that the "lower section has potential for spawning and rearing anadromous fishes, after removal of barriers below the sections of this survey." Def. Ex. B. The CDFG noted several "possible" and "potential" barriers to fish migration on the East Branch North Fork Mattole River located below its confluence with Sulphur Creek, but recommended the removal of the first barrier in order to open up spawning and rearing habitat. *Id.* at 2. The surveyors did not observe any anadromous fish and attributed their failure to do so to the barriers obstructing migration. *Id.* at 3.

CDFG conducted a stream survey of Sulphur Creek on July 1, 1982, also "to assess its value as anadromous fish habitat." Def. Ex. DD. The surveyors determined that Sulphur Creek's "importance stems from its substantial winter flows into the Mattole River." *Id.* In assessing its value as anadromous fish habitat, the survey found that the gradient ranged from 4–5% in the bottom half to an average of 10% in the upper section and that the lower section "is potential spawning area for anadromous species," although not utilized because of obstructions. *Id.* at 1–2. The surveyors, however, observed no anadromous fish, and recommended that the "creek should be managed for RT [resident trout]." *Id.* CDFG conducted another stream survey of Sulphur Creek along its length from its confluence with the East Branch North Fork Mattole River on September 1 and 2, 1988. Def. Ex. A, at 2. The surveyors found that the stream gradient of Sulphur Creek ranged from 3% at its mouth to 8% percent at its upper reaches. The surveyors also found two barriers to migration, both located in the upper reaches of Sulphur Creek. The surveyors, however, found no coho and few other fish species, observing that "Sulphur Creek is still recovering from past floods." *Id.* at 8.

On August 17 and 18, 1998, Ruthann Schulte and Greg Moody conducted another streambank and direct observation survey of Sulphur Creek and the East Branch North Fork Mattole River for PALCO. Def. Ex. L. The PALCO surveyors observed no coho. However, the surveyors observed several steelhead, mostly of the 0+ age category and a few of the 1+ age group. Again, on September 1, 1998, PALCO conducted a direct observation survey of Sulphur Creek and East Branch North Fork Mattole River to determine the species composition of salmonids in the Mattole River watershed using a CDFG protocol. No coho were observed, but the surveyors observed a large number of steelhead in various age classes from young-of-the-year to age 3+. *See* Def. Ex. O. The survey also noted gradients of 3–4% in both the East Branch North Fork Mattole River and Sulphur Creek, with gradients in some portions of Sulphur Creek reaching 5% or greater. Finally, on September 17, 1998, Barrett conducted a direct visual observation survey of Sulphur Creek to determine the presence of coho. Again, he observed no coho, but noted some "excellent coho microhabitat if present." Def. Ex. P. Barrett also observed

steelhead in abundance; however, the steelhead numbers he recorded were significantly less than those observed during the August 17 and 18 surveys. *Id.*

In contrast, on July 25, 1998, Johnson conducted direct visual observations of Sulphur Creek and the East Branch North Fork Mattole River as part of the Kier surveys on behalf of NMFS, as described above. In Sulphur Creek, Johnson surveyed 5 pools in the early afternoon and recorded 8, 34, 7, 11 and 16 coho young-of-the-year respectively, 15 $0^+$ steelhead in the first pool, and 11, 13, 1, 7 and 5 $1^+$ steelhead. Pl.Ex. 14. He recorded the pool temperatures to be 74 F̃, 74 F̃, 74 F̃, 76 F̃ and 81 F̃. *Id.* In the East Branch North Fork Mattole River, Johnson surveyed 3 pools and observed 66, 194, and 19 $0^+$ coho respectively, 39 and 3 $0^+$ steelhead in the second and third pools, and 19, 47, and 5 $1^+$ steelhead. Pl.Ex. 15. Johnson also recorded the pool temperatures to be 70 F̃, 76 F̃ and 72 F̃. *Id.*

The court singles out for its analysis the second pool, which Johnson describes as the "confluence pool where Sulphur Creek enters the East Branch North Fork Mattole River." Along with the extreme temperatures, Johnson's description of the pool does not appear to match Roelofs' description of preferred coho habitat:

> Heavy algae growth with primarily sandy substrate with some boulder cover at the pool edges. No canopy cover, some buried woody debris along RB. Approximate 7 foot sediment terrace on LB, 3 foot sediment terrace on RB gravel bar. 1 $^+$ SH holding at head of pool primarily, seven half-pounders were observed. Coho heavy in tail and middle of the unit. Stratification felt through unit from Sulphur creek and cold subsurface flow through the bar.

*Id.* When pressed to explain the divergence between preferred coho habitat and his observations, Johnson indicated that the coho he saw looked "stressed" and further noted that the pool temperatures that he recorded may not have reflected actual temperatures at lower depths where the coho were located. In contrast to Johnson's measurements, the August 17, 1998, survey observed only steelhead, of which 75 were in the $0^+$ age class, 6 $1^+$, 6 $2^+$ steelhead and 2 $3^+$ steelhead. *See* Def. Ex. O, at 2. On September 17, 1998, Barrett observed 29 $0^+$ steelhead and 7 $1^+$ steelhead in what he called the "junction" pool. He further noted the "pool w/o any shelter—contained only steelhead. Do not believe pool would support 194 fish of any kind." Def. Ex. P. Again, Johnson had no explanation for the differences between his observations and those performed by PALCO. When questioned by the court, Johnson conceded that Kier raised concerns about the temperature thresholds that he observed and his identification of the coho.

In summary, the court makes the following findings of fact for its section 7(d) analysis with respect to the Mattole River watershed:

1. The court finds that no coho are present in Sulphur Creek and strongly doubts the historical presence of coho salmon in the Sulphur Creek watershed. The testimony and evidence regarding the Sulphur Creek ecology establishes that Sulphur Creek, with its relatively high gradients and water temperatures, is marginal coho habitat at best. The court also finds Johnson's testimony and observations to be less credible than those provided by PALCO. Johnson's findings conflict with thirty years of observations in Sulphur Creek and the East Branch North Fork Mattole River and are not compatible with the conventional wisdom regarding coho tolerance to high water temperatures.

2. Based on the historical presence data of Boberg and Kenyon and Roelofs' testimony, the court finds that coho salmon have occupied the North Fork Mattole River. The court further finds that the evidence establishes that plaintiffs have raised a serious question as to whether the North Fork Mattole River and lower portions of the East Branch North Fork Mattole River are suitable as coho habitat.

Finally, for its section 7(d) analysis, the court recognizes the testimony of Barrett and Roelofs regarding the downstream propagation of sediment and its effect on stream aggradation.

## LEGAL STANDARD

### A. Preliminary Injunction

██ Ordinarily, a moving party is entitled to preliminary injunctive relief if it demonstrates that: (1) it will suffer irreparable injury if the relief is denied; (2) it will probably prevail on the merits; (3) the balance of potential harm weighs in its favor; and, depending on the nature of the case, (4) the public interest favors granting relief. *Johnson v. California State Board of Accountancy*, 72 F.3d 1427, 1430 (9th Cir.1995). A court may also issue a preliminary injunction if it determines either that (1) the moving party is likely to succeed on the merits and there exists a possibility of irreparable injury, or (2) the moving party raises serious questions on the merits and the balance of hardships tips in its favor. *National Wildlife Federation v. Burlington Northern Railroad, Inc.*, 23 F.3d 1508, 1510 (9th Cir.1994). The latter framework does not comprise of two independent tests, but rather, represents the extremes of the continuum of equitable discretion. *Id.*

██ The traditional balancing test for injunctive relief is not appropriate when considering whether to grant preliminary injunctive relief under the ESA. "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id.* (citations omitted). Rather, a lesser standard in which "the balance of hardships and the public interest tips heavily in favor of protected species" must be applied. *Id.* (citing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). In order to secure injunctive relief, an ESA plaintiff is required to show that "a violation of the ESA is at least likely in the future." *Id.*

### B. Analytical Framework for the Endangered Species Act

The ESA contains both substantive and procedural provisions designed to protect endangered species and their habitat. *See* 16 U.S.C. §§ 1531–1543. Section 9 of the ESA makes it unlawful for any person to "take," i.e., to harm, kill or harass, any threatened or endangered species of fish or wildlife within the United States unless an incidental take permit ("ITP") or other exemption is obtained pursuant to section 10 of the ESA, 16 U.S.C. § 1539. 16 U.S.C. § 1538. In order to qualify for an ITP, a permit applicant must submit a conservation plan that includes, among other things, the steps an applicant will take to minimize and mitigate impacts on endangered species and alternative actions being considered. 16 U.S.C. § 1539(a)(2)(A).

Section 7(a)(2) of the ESA requires all federal agencies "to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence" of any endangered or threatened species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). An agency "action" is defined to mean all activities carried out by federal agencies, including, among other things, the granting of licenses and permits. *See* 50 C.F.R. § 402.02. The joint implementing regulations define "destruction or adverse modification" to mean "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.*

If the contemplated agency action "may affect" a listed species, section 7(a)(2) imposes a procedural duty on the federal agencies to consult with one of the Services, depending on the protected species affected by the proposed action. 16 U.S.C. § 1536(a)(2). Once the consultation process required by section 7(a)(2) is initiated, section 7(d) prohibits the agency or the permit applicant from making "any irreversible or irretrievable commitment of re-

sources which has the effect of foreclosing the formulation or implementation of any reasonable or prudent alternative measures which would not violate" section 7(a)(2). 16 U.S.C. 1536(d); *see also* 50 C.F.R. §§ 402.09 & 450.01 (defining "irreversible and irretrievable commitment of resources"). Although defendants maintain that the requirements of section 7(d) apply only to federal agencies but not to private parties, section 7(d) expressly applies to private actors such as PALCO whose activities require formal federal authorization. *See* 16 U.S.C. § 1536(d) (prohibiting both federal agencies and "the permit or license applicant" from irretrievably committing resources); 50 C.F.R. § 402.02; *see also Natural Resources Defense Council v. U.S. Dep't of the Interior,* 113 F.3d 1121, 1126 (9th Cir.1997) ("Other privately-owned lands would also be subject to section 7 requirements if their use involved any form of federal agency authorization or action")

At the close of the consultation period, the Services must issue an opinion evaluating how the agency action affects the species or its critical habitat. 16 U.S.C. § 1536(b)(3)(A). If the Services find that the action jeopardizes a species or adversely modifies its critical habitat, it must suggest reasonable and prudent alternatives to the offending agency action. *Id.*

### C. *Standing*

▓▓▓▓ An Article III court cannot entertain the claims of a litigant unless that party has demonstrated the threshold jurisdictional issue of whether it has constitutional and prudential standing to sue. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). The party invoking federal jurisdiction bears the burden of establishing three requirements in order to meet the "irreducible constitutional minimum of standing." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. The plaintiff must have suffered an "injury in fact" that is both concrete and particu-

larized and actual or imminent. *Id.* The injury must be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court. *Id.* at 560–61, 112 S.Ct. 2130. Finally, it must be "likely," as opposed to "merely" "speculative," that the injury will be redressed by a favorable decision. *Id.*

▓▓▓▓ The Supreme Court has also recognized a prudential component to standing requiring that the plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision invoked. *Bennett v. Spear,* 520 U.S. 154, 161–63, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997). However, because the ESA civil suit provision broadly permits "any person" to institute an action to enforce the ESA's provisions, section 1540(g) applies to actions against private violators of the ESA's restrictions, as well as to actions against the Secretary of Interior asserting both the over enforcement and under enforcement under of the ESA's provisions. *Id.* at 165–168, 117 S.Ct. at 1163. The Court's "readiness to take the term 'any person' at face value" for the purposes of negating the zone-of-interests test under the ESA was in part because "the overall subject matter of this legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of [section 1540(g) ] is to encourage enforcement by so-called 'private attorneys general.'" *Id.* at 165, 117 S.Ct. at 1162.

### DISCUSSION

Plaintiffs contend that PALCO's continued logging in the lands within the THPs at issue will threaten habitat critical to the survival of the coho salmon. They also maintain that the consultation process required by section 7(a)(2) has already been initiated by PALCO, triggering the requirements of section 7(d). Plaintiffs ask the court to enjoin any further logging activities within the boundaries of the three THPs because a serious question exists whether continued logging consti-

tutes an irreversible and irretrievable commitment of resources which will likely foreclose the formulation or implementation of any reasonable or prudent alternative measures under section 7(d).

The parties raise four issues to be resolved in addressing plaintiffs' motion for preliminary injunctive relief. Two are jurisdictional: (1) whether plaintiffs have standing to sue; and (2) whether plaintiffs provided to PALCO the requisite notice of intent to sue required by the ESA, 16 U.S.C. § 1540(g)(2)(A)(i). Two are substantive: (1) whether the section 7 consultation requirements apply to ITP applications under section 10(a) of the ESA, and if so, whether the requisite consultation has been initiated to trigger the section 7(d) prohibitions; and (2) whether plaintiffs have made a sufficient showing that PALCO's timber harvesting in the areas of the proposed THPs is an irreversible or irretrievable commitment of resources in violation of section 7(d). Defendants also ask the court to clarify whether the temporary restraining order issued by Judge Henderson permits PALCO to recover timber already felled, but not removed from the forest floor.

### I. *Jurisdiction*

#### A. *Standing*

█ In its supplemental briefing filed at the close of the hearings, PALCO asserts that plaintiffs do not have standing to pursue this action. As held in *Coho Salmon v. Pacific Lumber Co.*, 30 F.Supp.2d 1231 (N.D.Cal.1998), environmental organizations such as EPIC and Sierra Club have standing to sue under the ESA on behalf of their members if they are able to establish that (1) their members would have standing to sue on their own; (2) the interests they seek to protect are germane to their purpose, and (3) their claim and requested relief do not require participation by individual members. *Id.* at 1239–40 (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)) (" 'on his behalf' phrase in section 1540(g) does not

limit the ability of an environmental organization to represent the interests of its members"); *see also Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members"). PALCO neither disputes that EPIC and Sierra Club seek to protect interests that are germane to their purpose nor that the relief sought requires the participation of the individual members of EPIC or Sierra Club.

█ Plaintiffs bear the further burden of establishing (1) that their members have suffered an actual or imminent injury that is concrete and particularized rather than conjectural or hypothetical; (2) that a causal connection that is "fairly traceable" links the injury to the conduct complained of; and (3) a likelihood of redressability in the event of a favorable decision. *Defenders of Wildlife*, 504 U.S. at 559, 112 S.Ct. 2130. PALCO maintains that plaintiffs have failed to establish that their members have suffered an injury in fact and that its activities are the cause of plaintiffs' injury. Specifically, PALCO contends that even after four days of testimony and the submission of numerous documents plaintiffs have been unable to point to the presence of coho in any of the watersheds at issue or that PALCO's activities in each of the watersheds at issue "jeopardize the continued existence" of coho in those watersheds. PALCO, however, overreaches in its contention on the merits that plaintiffs have failed to establish that its timber harvesting operations actually "take" or "jeopardize the continued existence" of coho. "Whether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits." *Animal Legal Defense Fund, Inc. v. Glickman* ("*ALDF*"), 154 F.3d 426, 441 (D.C.Cir.1998) (quoting *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C.Cir.1997)).

█ Rather, in order to meet the injury in fact requirement, plaintiffs must sim-

ply show that one or more of their members would be "directly affected apart from their special interest in the subject." *Defenders of Wildlife,* 504 U.S. at 563, 112 S.Ct. 2130. Although "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing," the injury in fact test "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 562–63, 112 S.Ct. 2130. At a minimum, the facts must show that one of plaintiffs' members is susceptible to "actual or imminent" injury. *Defenders of Wildlife,* 504 U.S. at 564, 112 S.Ct. 2130. Plaintiffs have alleged that their members live or use lands and waters which contain coho habitat near PALCO's lands and derive scientific, recreational and aesthetic benefits from the presence of coho. Compl., at ¶ 13. The testimony of Michael Evenson further demonstrated to the court that numerous individuals, undoubtedly members of either EPIC or Sierra Club, dedicate their time and energy in the lands and waters near the watersheds at issue and derive aesthetic enjoyment from coho and other fish species. Finally, the testimony and submissions confirm that coho are present in both the Mattole and Eel Rivers and that coho have been present in the recent past in Bear Creek. *See Silver v. Babbitt,* 924 F.Supp. 976, 986 (D.Ariz.1995) ("continued timber activity establishes an injury in fact" in light of Ninth Circuit holding that timber cutting constitutes a *per se* section 7(d) violation).

 Furthermore, Roelofs' testimony provided a sufficient link between PALCO's logging operations and degradation to streambeds and the resulting harmful effects on coho salmon. The fairly traceable element explores whether a causal link between the challenged conduct and the alleged harm exists. *Loggerhead Turtle v. County Council of Volusia County, Florida,* 148 F.3d 1231, 1247 (11th Cir.1998), *pet. for cert. filed,* 67 U.S.L.W. 3470 (Jan. 14, 1999). The causal link between the alleged harm and the challenged conduct

may become too attenuated "if the injury complained of is 'the result of the independent action of some third party not before the court.' " *Bennett,* 117 S.Ct. at 1164 (quoting *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130) (internal quotations and citations omitted). Roelofs, however, described in detail the link between mass wasting and sedimentation resulting from logging operations and the aggradation of streams and their loss of complexity, resulting in loss of preferred coho habitat and higher water temperatures. Roelofs also noted the downstream effects of increased sediment flows, which may affect coho in both the Mattole and Eel Rivers. *See Silver,* 924 F.Supp. at 986. Contrary to PALCO's contentions, plaintiffs have at this stage of the litigation established a sufficient injury in fact and causal connection between PALCO's operations in the THPs at issue and the alleged harm suffered.

**B.** *Notice of Intent to Sue*

 PALCO argues that the court lacks jurisdiction over plaintiffs' section 7(d) claim because plaintiffs failed to give sixty days notice of intent to sue under section 7 of the ESA, as required by section 11(g) of the ESA, 16 U.S.C. § 1540(g). Section 11(g) imposes an absolute jurisdictional bar to bringing suit under the ESA unless the plaintiff has provided written notice of the alleged violation to the Secretary of the Interior and to the alleged violator at least sixty days before bringing suit. 16 U.S.C. § 1540(g)(2)(A)(i); *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir.1998). In particular, PALCO asserts that plaintiffs' notice letter dated June 4, 1998, alleges only that the Services are in violation of section 7(d), but omits any reference to PALCO's failure to comply with section 7(d)'s requirements. *See* Cummings Decl., Ex. B, at 12.

 In response, plaintiffs point to page 12 of their notice of intent to sue, which first states that because the proposed approval of the HCP and the issu-

ance of the ITP are agency actions that require "formal section 7 consultation, NMFS, the FWS and PALCO have been . . . subject to the prohibition" against a section 7(d) commitment of resources. Cummings Decl., Ex. B, at 12. In the next paragraph, the notice letter reads:

> since September 1996, PALCO has unlawfully harvested and continues to unlawfully harvest timber in a manner that constitutes an irreversible and irretrievable commitment of resources that forecloses consideration of reasonable and prudent alternatives in violation of section 7(d).

*Id.* The notice letter sufficiently provides adequate notice to PALCO of plaintiffs' intent to bring a section 7(d) claim against defendants. The court therefore has jurisdiction over this action.

### II. *Section 7 Requirements*

PALCO provides three arguments which it asserts preclude the imposition of a preliminary injunction pending a decision on the merits. First, PALCO contends that the section 7(a)(2) consultation requirement does not apply to agency action in connection with the issuance of an ITP pursuant to section 10. PALCO further maintains that section 7 applies only to the initiation of "formal" consultation, and therefore, the requirements of section 7(d) have not been triggered. Finally, PALCO maintains that it has not made an irreversible or irretrievable commitment of resources which has the effect of foreclosing formulation or implementation of reasonable and prudent alternatives. The court

does not address each of these arguments holus-bolus, but rather, takes up each sequentially.

### A. *Interaction Of Section 7 and Section 10 Of The ESA*

PALCO initially contends that the section 7(a)(2) consultation requirement is not meant to apply to the Services' consideration of ITP applications under section 10(a)(1)(B). In doing so, it argues that the ESA's statutory scheme does not readily encompass any form of "internal" consultation within the Services, and further, that the section 7 consultation process is "extravagant and duplicative" given the procedures required under the section 10 permitting process.

Neither the plain language of the ESA nor the Services' interpretation regarding the applicability of the section 7 consultation requirement during the ITP approval process support PALCO's argument. The plain language of section 7(a)(2) requires that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary" insure that any agency action is not likely to jeopardize the continued existence of a protected species or result in the destruction or adverse modification of its critical habitat. Neither section 7(a)(2) nor section 10(a)(2), which sets forth the procedural requirements for the issuance of an ITP, make any distinction between the types of agency actions that must be evaluated through the consultation process nor do they exempt the section 10 permitting process from section 7's requirements.[7] The legislative history to

---

7. Section 10(a)(2) provides:

(A) No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a conservation plan that specifies—
 (i) the impact which will likely result from such taking;
 (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;
 (iii) what alternative actions to such taking the applicant considered and the rea-

sons why such alternatives are not being utilized; and
 (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.
(B) If the Secretary finds, after opportunity for public comment, with respect to a permit application and the related conservation plan that—
 (i) the taking will be incidental;
 (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
 (iii) the applicant will ensure that adequate funding for the plan will be provided;

which PALCO points in support of its argument also does not compel a contrary conclusion.[8]

Similarly, the joint implementing regulations promulgated by the Services do not give rise to the conclusion that the ITP application process is exempt from the requirements of section 7. *See* 50 C.F.R. §§ 402.01 & 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control"). "Each Federal agency" is required to review its actions to determine whether "any action" may affect listed species or critical habitat. 40 C.F.R. § 402.13. An "action" is defined by the Services to include:

> all activities of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States and the high seas. Examples include, but are not limited to:
>
> (a) actions intended to conserve listed species or their habitat;
>
> (b) the promulgation of regulations;
>
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
>
> (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02. PALCO's application for an ITP therefore clearly contemplates an "agency action." Furthermore, the issuance of an ITP to PALCO clearly "may affect" coho salmon since the ITP authorizes the taking of coho as a consequence of its logging operations. *See Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1055 (9th Cir.1994), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995) (U.S. Forest Service land management plans were "actions that 'may affect' the protected salmon because the plans set forth criteria for harvesting resources within the salmon's habitat").

 Finally, the Services confirm the conclusion that section 7 requires an intra-Services consultation regarding the issuance of each permit application under section 10(a)(1)(B). In responding to commentators' concerns regarding the Services' adherence to the section 7 consultation requirements in connection with a "no-surprises" policy in providing regulatory assurances to the holder of a Habitat Conservation Plan (HCP) incidental take permit issued under section 10(a), the NMFS and FWS jointly stated:

> The Services are committed to meeting their responsibilities under section 7(a)(2) of the ESA. *As required by law, the Services conduct a formal intra-Ser-*

---

> (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and
>
> (v) the measures, if any, required under subparagraph (A)(iv) will be met;
>
> and he has received such other assurances as he may require that the plan will be implemented, the Secretary shall issue the permit.

16 U.S.C. 1539(a)(1).

8. The House Conference Report 97–835 to the Endangered Species Act Amendments of 1982, Pub.L. No. 97–304, 96 Stat. 1411 (1982), states that:

> The Secretary will base his determination as to whether or not to grant the permit, in part, by using the same standard as found in section 7(a)(2) of the Act, as defined by Interior Department regulations, that is whether the taking will appreciably reduce the likelihood of the survival and recovery of the species in the wild. Use of the regu-

latory language adopted by the Secretary of the Interior to implement section 7(a)(2) rather than the language of the provision itself eliminates the implication that other permits issued under section 10 do not require consultation and biological opinions issued pursuant to section 7.

H.Conf.Rep. No. 97–835, 97th Cong., 2nd Sess. 29–30 (1982), *reprinted in,* 1982 U.S.C.C.A.N 2807, 2870–71 (1982). Although PALCO asserts that the above paragraph establishes that Congress intended to eliminate the section 7 consultation requirement for incidental take permits under section 10(a)(1), the language simply emphasizes that section 7(a)(2) consultation is required prior to the issuance of "other permits under section 10" and not that the consultation requirement is eliminated in the consideration of ITP applications.

vice section 7 consultation regarding the issuance of each permit issued under section 10(a)(1)(B). The purpose of any consultation is to insure that any action authorized, funded, or carried out by the Federal government, including the issuance of an HCP permit, is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat of such species.

63 Fed.Reg. 8859, 8861–62 (Feb. 23, 1998) (emphasis added). Similarly, the Habitat Conservation Planning Handbook issued by the Services specifically provides for an "internal" section 7 consultation prior to the issuance of an ITP. *See* Habitat Conservation Planning Handbook at 6–11 to 6–16, http://www.fws.gov/r9endspp/hcp/hcpbook.htm.

The court gives "deference to a reasonable interpretation of a statute by an administrative agency charged with its implementation." *Ramsey v. Kantor*, 96 F.3d 434, 442 (9th Cir.1996) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Thus, the section 7 consultation requirement applies equally to the Services' actions in connection with the issuance of an ITP pursuant to section 10(a)(1)(B) as it does to other federal agency actions that may affect endangered or threatened species.

B. *Section 7(a)(2) Consultation Requirements*

PALCO next contends that the requirements of section 7(d) have not been triggered because the Services have not yet initiated the requisite consultation required by section 7(a)(2). It maintains that only a "formal" consultation, as contemplated in the ESA's implementing regulations, satisfies the section 7(a)(2) consultation requirement.

At the conclusion of the first hearing on plaintiffs' motion for preliminary injunction, the court held that neither section 7(d) nor its implementing regulations expressly require a "formal" consultation before its prohibition against an irretriev-

able or irreversible commitment of resources is triggered. *See* 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. The regulations promulgated under section 7(a)(2) provide for both informal and formal consultation. Informal consultation is an "optional process that includes all discussions, correspondence, etc., ... prior to formal consultation, if required." 50 C.F.R. § 402.02; 50 C.F.R. § 402.13. In contrast, formal consultation is a process that "commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act" and is mandated if an agency determines that an action "may affect" critical species or habitats. *Id.;* 50 C.F.R. § 402.14(a). *See also Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998), *pet. for cert. filed*, 67 U.S.L.W. 3394 & 3410 (Dec. 7, 1998). A formal consultation is not required if "as a result of informal consultation" the agency determines that the proposed action is not likely to have an adverse effect on a listed species or its critical habitat and the Services concur in writing. 50 C.F.R. § 402.13.

Both informal and formal consultation satisfy the consultation process required under section 7(a)(2). *See American Rivers v. NMFS*, 126 F.3d 1118, 1122 (9th Cir.1997) (agency must consult formally or informally with Services if action "may affect" listed species); *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 728 (10th Cir.1997) ("section 7(a)(2) does not require formal consultation if the BLM has informally consulted the FWS, the FWS has issued a written concurrence in the action"); *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C.Cir.1997) (citing 50 C.F.R. § 402.13(a)) ("To the extent that there was an ESA consultation obligation, the Forest Service and FWS fulfilled it by engaging in 'informal consultation' in February and March 1995 pursuant to the 'joint regulations' promulgated by FWS and the National Marine Fisheries Service"). An

ITP, by its very nature, is issued to a permit applicant because its activities may result in the "taking" of listed species, and therefore, "may affect" those species. *See* 16 U.S.C. § 1539(a); *Pacific Rivers Council,* 30 F.3d at 1055. Thus, neither the Services nor the ITP applicant may irreversibly or irretrievably commit resources which foreclose the implementation or consideration of reasonably prudent alternatives if the Services have initiated either an informal or formal consultation. *See Houston,* 146 F.3d at 1127 & 1128 n. 6 (Bureau of Land Management not permitted to make an irreversible or irretrievable commitment of resources either during or prior to the initiation of formal consultation); *Pacific Rivers Council,* 30 F.3d at 1056 (prohibiting commitment of resources prior to initiation of consultation process for activities which "may affect" listed species). *See also* 63 Fed.Reg. at 8862 (in Services' case, issuance of ITP prior to or during consultation is violation of 7(d)).

Plaintiffs contend that the actions of the Services and PALCO established that they have initiated the required consultation under section 7(a)(2) to trigger the section 7(d) requirements in processing PALCO's ITP application. For example, plaintiffs point to the Services' Habitat Conservation Planning Handbook, which states that informal consultation begins during the HCP development phase when assistance is provided to the ITP applicant. Gaffney Decl., at 6. It further states that formal consultation on an ITP application usually begins during the permit processing phase. *Id.* at 7. On February 27, 1998, the parties to the Headwaters Agreement signed a "Pre-Permit Application Agreement in Principle" setting forth principles to guide PALCO in preparing its HCP submission to the Services for evaluation. 63 Fed.Reg., at 37900. PALCO subsequently submitted both a permit application and an HCP to the Services, and the Services initiated the public review process required by section 10(c). *Id.* During this process, the Services exchanged numerous letters which discussed whether the THPs at issue would result in adverse effects to the aquatic environments of the various areas within the boundaries of the THPs. *See* Cummings Decl., Exs. M – Q; Gaffney Decl. in Supp. of Prelim. Inj, at 7. The court therefore concludes that the exchange of letters between PALCO and the Services, along with the issuance of the public comment notice on PALCO's HCP and ITP application, is sufficient to raise a serious question of whether an informal consultation within the meaning of section 7(a)(2) had been initiated, triggering the section 7(d) requirements.

On November 16, 1998, the Services sent to PALCO a letter notifying PALCO that the Services had initiated formal consultation on the Services' proposals to issue incidental take permits to PALCO pursuant to section 10(a)(1)(B) of the ESA and 50 C.F.R. Parts 17 and 222. *See* Letter dated November 16, 1998 from the Services to John Campbell ("November 16 letter"). The Services also stated:

> Based on the initiation of formal consultation, the provisions of section 7(d) of the Act and 50 C.F.R. 402.09 now apply. Under Section 7(d) PALCO may make no irreversible or irretrievable commitment of resources that would have the effect of foreclosing the formulation or implementation of any reasonable or prudent alternatives which would avoid violating section 7(a)(2) of the Act.

*Id.* Although PALCO contends that the initiation of formal consultation by the Services moots any distinction between informal and formal consultation with respect to activities occurring after November 16, 1998, there is no reason to distinguish between the effect of formal and informal consultation. The implementing regulations do not distinguish between informal and formal consultation, but rather, forbids the irreversible or irretrievable commitment of resources "during the consultation process and continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. Thus, if PALCO is not permitted to engage in activities that constitute an irreversible and irretrievable

commitment of resources during the formal consultation period, it is also not permitted to do so during the informal consultation period as well. *See Houston,* 146 F.3d at 1128 n. 6 (citations omitted); *cf. Pacific Rivers Council,* 30 F.3d at 1056–57 (section 7(d) does not apply until Services initiate consultation).

### C. *Section 7(d) Commitment of Resources*

Plaintiffs are entitled to a preliminary injunction if they are able to demonstrate "sufficiently serious questions going to the merits" of whether continued logging operations by PALCO violate section 7(d). *See Sierra Club v. Marsh,* 816 F.2d 1376, 1382 (9th Cir.1987); 16 U.S.C. § 1536(d) (emphasis added) ("the Federal agency *and the permit or license applicant* shall not make any irreversible or irretrievable commitment of resources with respect to the agency action"). "Section 7(d) of the Act prohibits Federal agencies and applicants from making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives which would avoid jeopardizing the continued existence of listed species or resulting in the adverse modification of critical habitat." 50 C.F.R. § 402.01; *see also* 16 U.S.C. §§ 1536(a)(2) & (d). In determining whether PALCO has made an irreversible and irretrievable commitment of resources, the court is mindful of its "responsibility under [the ESA] ... to preserve the status quo where endangered species are threatened, thereby guaranteeing the legislative or executive branches sufficient opportunity to grapple with the alternatives." *See TVA,* 437 U.S. at 169, 98 S.Ct. 2279 (quoting *Hill v. TVA,* 549 F.2d 1064, 1070 (6th Cir.1977)); *Conner v. Burford,* 848 F.2d 1441, 1455 n. 34 (9th Cir.1988), *cert. denied sub nom., Sun Exploration and Production Co. v. Lujan,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989) ("section 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process").

Despite PALCO's contentions to the contrary, plaintiffs have raised a serious question regarding their likelihood of prevailing on the merits on whether PALCO has made an irreversible or irretrievable commitment of resources in violation of section 7(a)(2). Roelofs' testimony regarding the historical presence of coho and the submissions of the stream surveys and anadromous fish habitat assessments by the CDFG and others confirm that both the Bear Creek drainage and the North Fork Mattole watershed contain coho habitat. Although plaintiffs failed to provide the court with reliable present observations of coho in either the Bear Creek watershed or the Sulphur Creek drainage, historical presence data establishes that coho occupied both Bear Creek and the North Fork Mattole River, of which Sulphur Creek is a tributary. Roelofs furthermore provided the court with significant testimony that coho and other salmonids do not utilize all the coho habitat available at all times. Given that the coho population is significantly depleted, the probability of observing coho at a given time is unlikely to be great.

Moreover, the testimony of Barrett and Roelofs establishes that the coho and its habitat may be adversely affected by continued logging operations in each of the THPs in a manner that forecloses the formulation and implementation of alternative measures. Although Barrett noted that PALCO is required to implement "zero net sediment" measures as part of its HCP, plaintiffs' evidence showing that logging operations can cause significant mass wasting of steeply sloped hillsides and that sediment can propagate downstream to cause severe aggradation of streams and degradation of coho habitat strongly supports the contention that the PALCO's timber harvesting operations constitute an irreversible commitment of resources which would result in the destruction or adverse modification of coho habitat. *See,*

*e.g., Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290, 295 (9th Cir.1992) (timber management plans at issue violated § 7(d)); *Pacific Rivers Council*, 30 F.3d at 1057; *Silver*, 924 F.Supp. at 988 (granting an environmental plaintiff's request to enjoin proposed timber harvesting plans on federal and Indian lands); *but see Forest Conservation Council v. Espy*, 835 F.Supp. 1202, 1216 (D.Idaho 1993), *aff'd* 42 F.3d 1399 (9th Cir.1994) (table) (road work approved by NMFS and designed to control erosion problems associated with road and to improve salmon habitat not irretrievable or irreversible commitment of resources). The example of the 1997 debris torrent in Bear Creek cited to by Barrett provides a compelling example of the effect of severe erosion on coho habitat which constitutes a commitment of resources that forecloses the formulation and implementation of alternative measures.

■ Plaintiffs have therefore made a sufficient showing that the logging operations are an irreversible and irretrievable commitment of resources in violation of section 7(d) to make a preliminary injunction appropriate. Moreover, although PALCO protests that it will suffer significant economic harm if a preliminary injunction issues, the balance of hardships and the public interest in ESA cases such as this tips heavily in favor of the protected species. *See NWF*, 23 F.3d, at 1510; *Marsh*, 816 F.2d at 1386 (ESA does not permit court to consider hardship an injunction may impose on project if endangered species' habitat is likely to be destroyed).

In response, PALCO raises a host of arguments which the court finds have little merit. For example, PALCO contends that a preliminary injunction will hinder other efforts of the Services to cooperate with the private sector in achieving species conservation and recovery on private lands pursuant to section 10 of the ESA. The court's order does not preclude PALCO from making any economic use of the property, but rather, forbids it from making an irreversible and irretrievable commitment of resources under section 7(d) until the consultation process required by section 7(a)(2) is complete. *See Pacific Rivers Council v. Thomas*, 873 F.Supp. 365, 371 (D.Idaho 1995). In a related argument, PALCO exhorts the court to exercise its equitable discretion and refrain from enjoining its operations in order to allow defendants the opportunity to complete the public review and comment period. To do so, however, would permit PALCO to continue to violate section 7(d).

PALCO also argues that the Services cannot regulate PALCO's timber harvesting operations because timber harvesting on private lands in California falls within the jurisdiction of the California Department of Forestry and Fire Protection. It further argues that all of the cases to which either party cites involve only federal agencies authorizing activity on federal lands. Section 7(d) applies both to public and private lands, to any action requiring federal authorization, and to federal agencies and permit applicants, irrespective of whether the applicant is a private or public actor. 15 U.S.C. § 1536(d); 50 C.F.R. § 402.02. PALCO applied for an ITP under section 10 to permit it to take endangered or threatened species on its private lands, triggering the consultation requirements of section 7. Thus, although PALCO may correctly assert that the regulation of timber harvesting falls within the jurisdiction of the state, the Services may exercise limited jurisdiction over PALCO's timber operations to the extent that its harvesting activities threaten endangered or threatened species or critical habitats.

*CONCLUSION*

For the foregoing reasons, the court hereby GRANTS plaintiffs' motion for preliminary injunction. Pending further orders of this court, PALCO and its subsidiaries are hereby enjoined from conducting any further logging or other activities consistent with this order within the boundaries of the Timber Harvest Plan Nos. 1–96–413 HUM, 1–96–307 HUM, and 1–97–286 HUM. Defendants are also enjoined

from recovering and removing logs already felled by PALCO and which now lie on the forest floor.[9] The preliminary injunction shall remain in effect pending resolution of this action on the merits.

This order fully adjudicates the motion reflected at Docket #3 and the Clerk of the Court shall remove it from the pending motions list.

IT IS SO ORDERED.

---

9. The effects of recovering and removing logs already felled by PALCO and which now lie on the forest floor were considered at the September 3, 1998, hearing. Given the testimony of Roelofs regarding increased erosion and the loss of woody debris in the watersheds at issue, the court finds that maintaining the status quo by prohibiting the removal of felled logs is necessary. Finally, the court finds that at this stage of the proceedings resolving the issue of whether plaintiffs should be required to post a bond is not necessary.